IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CASE NO. 2:12-cr-048-MHT |
| | ) | |
| MICHAEL SMITH | ) | |

## REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE

### I. INTRODUCTION

Pursuant to 28 U.S.C. § 636(b)(1) this case was referred to the undersigned United States Magistrate Judge for review and submission of a report with recommended findings of fact and conclusions of law. The defendants, Michael Smith ("Smith"), Matthew Davidson ("Davidson"), and Joseph Sanders ("Sanders") (collectively "Defendants"), were charged with four counts of deprivation of civil rights in an indictment returned on March 8, 2012. The indictment alleges one count of obstruction of justice by an attempt to persuade, one count of conspiracy to obstruct justice, four counts of obstruction of justice by falsification of documents, four counts of obstruction of justice by misleading conduct, and three counts of false statements (Doc. 3).[1] Pending before the court is Michael Smith's *Motion for Hearing Pursuant to Kastigar v. United States* (Doc. 110) and *Motion to Suppress*

---

[1] The charges are listed cumulatively, not all of the defendants are charged under all of the counts listed.

*Statements* (Doc. 113).

The Court held an evidentiary hearing on the motions on December 4-5, 2012 (Doc 150). Based on the evidence presented to the Court, arguments of the parties, and for the reasons set forth herein the Magistrate Judge recommends that Michael Smiths' *Motion for Hearing Pursuant to Kastigar v. United States* (Doc. 110) and *Motion to Suppress Statements* (Doc. 113) be **DENIED**.

## II.   FACTS

FBI Special Agent Susan Hanson ("Hanson") works in the Dothan, Alabama Resident Agent Office ("RAO"). Hanson is the lead investigator in the federal investigation of the death of RM, a state of Alabama inmate formerly held at Ventress Correctional Facility, ("VCF") in Clayton, Alabama. RM died on August 4, 2010 after an alleged physical confrontation at VCF with correctional officers. In sum, the investigation led Hanson to conclude that during the evening hours of August 4, 2010, Brown, a female correctional officer, called for assistance during a physical altercation with RM in D-Dorm at VCF. Officers took RM outside D-Dorm where there was a physical struggle between Officers and RM. RM broke free from the officers and ran toward F-Dorm. RM saw another officer at F-Dorm and quit running. An officer put cuffs on RM and took him to the shift office inside F-Dorm. The shift office was assigned to Smith, who was then a Lieutenant at VCF, and the senior commanding officer on duty the night of the incident. Inside the shift office Smith and another officer assaulted RM. Shortly thereafter RM was taken to the VCF emergency room,

("ER"). In the ER Smith assaulted RM again by stomping on his head. After Smith left the ER the nurse began to assess RM and found his pupils fixed and dilated. Soon thereafter RM was taken to a hospital via ambulance, and was subsequently declared dead.

The death of RM triggered three separate investigations and Smith gave statements to each lead investigator. In addition, Smith as a matter of official protocol, completed an incident report and a duty officer report about the events which culminated in the death of RM. Smith moves to suppress the reports and all statements he made in the three investigations.

### III.   DISCUSSION

**A.   Knowing and Voluntary Waiver**

On October 17, 2011, FBI Special Agents Kelvin King ("King") and Hanson interviewed defendant Smith. Hanson set up the interview by calling Smith a day or two before the interview. When Smith came to the interview at the Opelika RAO, King and Hanson identified themselves as FBI Agents and told Smith the purpose of their interview. In the words of King and Hanson, Smith said he wanted to talk to the agents because he was eager to clear his name as he understood some people were spreading lies about him and his role in the death of RM. Neither King nor Hanson read Smith the *Miranda* warnings which would ordinarily be given to a person under arrest. King and Hanson did tell Smith at the outset that the interview was strictly voluntary, he could leave at any point, and he was free not to answer any questions he did not want to answer. Smith chose to answer questions and

began to outline his version of events leading up to the death of RM.

Early in the interview, Smith said he gave a duty officer statement and an incident report the night of the incident, and gave a statement to Internal Affairs ("IA") in the early morning hours after the incident. King and Hanson told Smith they had not seen Alabama Bureau of Investigation's ("ABI") report or the other reports because they were covered by *Garrity*. *See Garrity v. New Jersey*, 385 U.S. 493 (1967). Smith said he understood *Garrity* and did not care if they saw the statement because what he has said and what he planned to say during the current interview was consistent with what he said in the other reports. Agents King and Hanson received a *Garrity* waiver form and continued to question Smith about the incident after Smith signed the waiver form. The consent form states:

> I, ____[2], fully understand that some or all of my prior statements regarding allegations of excessive use of force against (R.M[3].) on August 4, 2010, in the Ventress Correctional Facility could be considered as having been given under administrative compulsion and therefore could not be used against me in any criminal investigation or proceeding. Nevertheless, I believe that all pertinent information should be provided to United States law enforcement officials in their investigation concerning these allegations of excessive force. I therefore knowingly, intelligently and voluntarily waive my constitutional and statutory right not to have those statements used against me, and I voluntarily give my consent that all of my prior statements be furnished to special agents of the Federal Bureau of Investigation, the Department of Justice, and the United States Attorney's Office, knowing that these prior statements may be used against me in any criminal investigation and proceeding regardless of whether I take the witness stand in any subsequent trial. [4]

---

[2] Smith wrote his name in the blank

[3] The victim's name is spelled out on the form

[4] Smith signed and dated the form at the bottom

Smith continued the interview and gave his version of events which he claimed to be truthful. Smith finished the interview and went about his business. Prior to the interview, the prosecutors used a wall to shield Agents King, Hanson, and the prosecutors assigned to this case from any *Garrity* taint. In sum, a paralegal had access to the portions which might contain *Garrity* taint and passed along a clean file to the prosecution team. None of the prosecutors or investigators assigned to the prosecution had access to any statements Smith moves to supress until after Smith signed the waiver form *supra*.

The Magistrate Judge finds that Smith made a knowing, intelligent and voluntary waiver of his rights against self incrimination and *Garrity*. *Miranda v. Arizona*, 384 U.S. 436, 444, 460-61(1966); *Garrity*, 385 U.S. at 493. The Magistrate Judge credits Agents King and Hanson that Smith was given a chance to tell his side of the story and voluntarily submitted to an interview. No one forced Smith to make a statement and he was told at the outset he was not under arrest and would be free to go whenever he chose to leave and that he could decline to answer any and all questions. To the extent Smith had any protections under *Garrity*, he likewise made a knowing, voluntary and intelligent waiver of his rights. *Garrity v. New Jersey*, 385 U.S. 493 (1967). Nothing in the character or conduct of the interview remotely compels a different result.

**B.     Incident and Duty Officer Reports**

While the extent to which *Garrity* may apply to the statements preceding the October 17, 2011 may be somewhat academic, the Magistrate Judge will analyze those statements as

well since the shadow cast by *Garrity* may fall upon the earlier statements. Smith prepared an incident report and a duty officer report as required by Alabama Department of Corrections ("ADOC") regulations. Smith presented no evidence to the Magistrate Judge which suggests that, but for the fear of losing his job or another adverse employment consequence, Smith would not have submitted either the incident report or the duty officer report. By all accounts and from the evidence before the Magistrate Judge, Smith completed the reports without prodding or any indication that from Smith's point of view that either report was something more than a routine report about an unusual event. The essence of *Garrity* is a government employee may not be forced to choose between keeping their job and the exercise of Fifth Amendment privileges. The trigger for *Garrity* protection is a subjective belief by the employee that dismissal or other discipline is the implied or express consequence if the employee does not provide the statement. *United States v. Vangates*, 287 F. 3d 1315, 1320 (11th Cir. 2002). *United States v. Cook*, 526 F. Supp 2d 1, 6-7 (D. D.C. 2007). Rather than testify,[5] Smith chose to rely upon the ADOC progressive disciplinary policy which would subject Smith to a warning, written reprimand, suspension, demotion, or dismissal if Smith did not complete the incident report or the duty officer report. While the Magistrate Judge agrees that Smith, a veteran employee of ADOC and indeed a Lieutenant, likely knew about the policy, for several reasons the Magistrate Judge does not conclude that but for the policy Smith would not have made the statements.

---

[5] The Magistrate Judge does not suggest that Smith had to or should have testified in this regard as surrounding facts may suffice to meet the element.

First, the Magistrate Judge notes from a plethora of testimony that Smith was the ranking officer in VCF during and for at least 30 minutes after the death of RM. When Warden Jessie Giles ("Giles") and Captain Cedric Specks ("Specks") came from their homes to VCF, Smith was not a suspect in criminal activity. Had Smith been a suspect from the outset, immediately after their arrival, Giles or Specks likely would have sent Smith away from VCF. The court credits the testimony of Agent Hanson that a key piece of evidence; *i.e.*, the baton allegedly broken during the assault within the shift office could not be found even though it is an accountable item and the shift office itself appeared to have been cleaned and put back in order. If Smith was indeed criminally responsible for the death of RM, Smith's motive to make the written statements more than likely was to deflect suspicion and avoid jail rather than his desire to retain his employment.

Next, suppression of evidence is appropriate when suppression serves a greater societal purpose. *Garrity* protections serve the societal purpose of allowing a governmental entity to obtain truthful information about an adverse event which in turn may enable to the governmental entity to prevent or reduce the quantity and severity of similar adverse events in the future while simultaneously protecting the Fifth Amendment rights of the declarant. If untruthful statements receive *Garrity* protections, no important societal interest advances. Indeed, suppression of untruthful statements under *Garrity* would subvert an equally important interest which is the supreme purpose of the judicial system – the search for truth within the protection of law. While the Magistrate Judge is not tasked to decide whether the

duty officer report and incident report are truthful or not, there is sufficient evidence to suggest Smith was not completely candid in the duty officer report and incident report.

While the Magistrate Judge does not conclude that Smith would not have made either statement, but for the potential adverse employment consequences of not making a statement, the Magistrate Judge as a cautionary matter extends *Garrity* protections to the duty officer report and incident report. While the duty officer report and incident report may have *Garrity* protection, *Garrity* is not a complete bar to their admission. *United States v. Apfelbaum*, 445 U.S. 115, 125, 131, 100 S.Ct. 948, 954, 957, 63 L.Ed.2d 250 (1980); *see also United States v. Veal*, 153 F.3d 1233, 1240-43 (11th Cir. 1998). *Apfelbaum* holds that immunized statements are admissible when the declarant is charged with perjury, false statements or obstruction of justice. *Id.* Count 7 of the indictment charges Smith with Obstruction of Justice-Falsification of Document when he submitted the duty officer report and incident report. Under *Apfelbaum*, the Magistrate Judge recommends that the District Judge overrule any objection to the duty officer report and the incident report which rests on *Garrity* to preclude admission of the two statements.

C.  **Internal Affairs**

First, at no point after being advised of his Fifth Amendment rights and *Garrity* rights by the IA Investigator Ronald Cooper ("Cooper") did Smith decline to or show any hesitation to make a statement which, by all accounts, were consistent with his statements to ABI and the FBI. Traditionally, *Garrity* is triggered upon a suspect invoking their Fifth Amendment

rights, and the interviewer compelling the suspect to speak under *Garrity* protection. Cooper explained to Smith that if he chose to invoke his Fifth Amendment rights, Cooper would then invoke *Garrity* to compel his testimony of the events that transpired that night. Smith never told Cooper his choice to answer questions was because he was compelled to do so nor did he show any reluctance to answer based upon his Fifth Amendment rights. Although Cooper did not give Smith the opportunity to invoke his Fifth Amendment rights prior to asserting that Smith will be compelled to talk regardless, all evidence presented clearly shows Smith's willingness to talk and present his account of the event.

However, similar to the reports discussed above, as an IA investigator for the ADOC, it could easily be inferred that despite a willingness to talk, Smith could objectively have believed he had no other choice. The Magistrate Judge, again, does not conclude that Smith would not have made statements to Cooper but for the potential adverse employment consequences of not making a statement; however, as a cautionary matter extends *Garrity* protections to the IA report. The difference between the duty officer and incident reports and the IA report, is that Smith has not been charged with making false statements to an IA investigator, so the false statement exception does not apply to that statement. Nonetheless, Smith chose to waive any *Garrity* protection the statement might have when he submitted to the FBI interview and signed the consent form.

### D. Alabama Bureau of Investigation

On August 9, 2010, Smith made statements to Corporal Timothy Rodgers

("Rodgers"), an agent with the ABI. Rodgers was the lead investigator in the separate State of Alabama criminal investigation into the circumstances surrounding the death of RM. The criminal investigation began after the August 6, 2010 autopsy report indicated further investigation was necessary. To conduct the investigation, Rodgers traveled to the Trooper office in Eufaula, Alabama with the intentions of interviewing the officers, medical staff, inmates or any other witnesses who might have information about the altercation between RM and the officers. When Rodgers got to Eufaula he knew nothing other than RM had died after an alleged confrontation with correctional officers and the purpose of the investigation was to flesh out what actions led to the death of RM. Rodgers called a Sergeant in VCF and told him to schedule appointments for all officers who were on duty the night RM died. When Smith came to the Trooper office, Rodgers identified himself and the purpose of the interview. Rodgers read the *Miranda* warnings to Smith and took pains to state that his investigation was separate from the IA investigation. Rodgers told Smith he did not know the contents of nor did he care about whatever statement he may have given IA as this was a separate criminal inquiry. After Smith consented to the interview Rodgers recorded their conversation. The Magistrate Judge finds that Rodgers understood the need to keep his criminal investigation separate from the IA investigation, and the attending *Garrity* issues, and did so. None of the information Smith gave to Rodgers came directly or indirectly from the IA investigation.

Rodgers did tell Ron Cooper that some of the corrections officers told Rodgers, during

his separate investigation, they had not been candid in their interviews with IA. Cooper gave Rodgers some physical evidence he obtained during the internal affairs investigation. The physical evidence consisted of a tooth, a baton, a wash cloth and a plastic container with hair in it. To preclude any *Garrity* taint, Rodgers and Cooper did not swap or discuss any statements any witness gave to IA. The Magistrate Judge finds none of the ABI investigation was tainted by any statements which might be within the ambit of *Garrity*.

**E.      Pre-Termination Hearing**

The final statement from Smith which might be within the reach of *Garrity* is the September 29, 2010 statement that Smith made to Warden Giles. Warden Giles sent Smith a pre-dismissal letter on September 20, 2010. In sum, the letter said that Warden Giles would meet with Smith on September 29, 2010 in Warden Giles' office so that Smith could give Warden Giles any information that Smith thought Warden Giles should consider in deciding whether to terminate Smith. The letter did not indicate that a statement was mandatory or that the statements might later be used in a criminal context. The letter did state that Smith could submit information or not which could be written or oral, and that Smith could have counsel at his own expense for consultation, but not for representation. Smith chose to appear and make statements.

The Magistrate Judge agrees with the United States that the statements Smith made at the pre-dismissal conference are not protected by *Garrity*. *United States v. Hutley*, 2010 WL 4223741, 9 (N.D. Ga. 2010). The Magistrate Judge concludes Smith was not compelled to

speak during the hearing within the meaning of *Garrity*. Smith could have relied upon many things other than his oral statements to defend himself. For instance, Smith could have cited his good record as a Corrections Officer, he could have used verbal or written statements from others which might have been helpful or Smith could have chose to present no evidence at all. In any event, the Magistrate Judge interprets *Garrity* to protect those statements a witness must make or suffer an adverse employment consequence. At the pre-dismissal hearing Warden Giles had already decided to terminate Smith based on the findings of the IA and/or criminal investigations rather than Smith's lack of response to the pre-dismissal letter.

As the Magistrate Judge finds there is no *Garrity* taint in either the ABI or FBI investigation, the Magistrate Judge recommends that the District Judge decline to convene a *Kastigar* hearing. *See Kastigar v. United States*, 406 U.S. 441 (1972).

### III. CONCLUSION

Accordingly, it is the RECOMMENDATION of the Magistrate Judge that the District Judge **DENY** Smith's *Motion for Hearing Pursuant to Kastigar v. United States* (Doc. 110) and *Motion to Suppress Statements* (Doc. 113).

It is further ORDERED that the Plaintiff file any objections to this Recommendation on or before **January 30, 2013**. Any objections filed must specifically identify the findings in the Magistrate Judge's Recommendation to which the party is objecting. Frivolous, conclusive or general objections will not be considered by the District Court. The parties are

advised that this Recommendation is not a final order of the court and, therefore, it is not appealable.

Failure to file written objections to the proposed findings and recommendations in the Magistrate Judge's report shall bar the party from a *de novo* determination by the District Court of issues covered in the report and shall bar the party from attacking on appeal factual findings in the report accepted or adopted by the District Court except upon grounds of plain error or manifest injustice.  *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982); *see Stein v. Reynolds Securities, Inc.*, 667 F.2d 33 (11th Cir. 1982); *see also Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981, *en banc*) (adopting as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981).

DONE this 16th day of January, 2013.

/s/ Terry F. Moorer
TERRY F. MOORER
UNITED STATES MAGISTRATE JUDGE