IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CASE NO. 2:12-CR-48-MHT |
| | ) | |
| MICHAEL SMITH | ) | |

**REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE**

## I. INTRODUCTION

Pursuant to 28 U.S.C. § 636(b)(1) this case was referred to the undersigned United States Magistrate Judge for review and submission of a report with recommended findings of fact and conclusions of law.  The defendants, Michael Smith ("Smith"), Matthew Davidson ("Davidson"), and Joseph Sanders ("Sanders") (collectively "Defendants") were charged with four counts of deprivation of civil rights in an indictment returned on March 8, 2012.  The indictment alleges one count of obstruction of justice by an attempt to persuade, one count of conspiracy to obstruct justice, four counts of obstruction of justice by falsification of documents, four counts of obstruction of justice by misleading conduct, and three counts of false statements (Doc. 3).[1]  Pending before this Court is Smith's *Motion to Dismiss Due to Failure to Preserve Evidence* (Doc. 112, filed October 29, 2012).

On December 4-5, 2012, the Court heard arguments and took evidence on the motion. (Doc 150).  From the evidence presented to the Court, arguments of the parties, and for the

---

[1] The charges are listed cumulatively, not all of the defendants are charged under all of the counts listed.

reasons herein the Magistrate Judge recommends that the motion to dismiss be **DENIED**.

## II.   FACTS

On the night of August 4, 2010, an altercation began in the D-Dorm between Officer Brown and RM during a lock down.   Officer Brown called for assistance.   Once other officers came to the scene, RM continued to struggle until he broke free and ran in the direction of the F-Dorm.   RM subsequently stopped resisting, was put in handcuffs, and taken to the lieutenant's office assigned to Smith.   At the time, Smith was a Lieutenant at Ventress Correctional Facility ("VCF"), and the senior officer on duty the night of the incident.   In the lieutenant's office, RM was still in handcuffs when he was assaulted again by Smith and another officer.   RM was then taken to the VCF emergency room in the Health Care Unit ("ER"), where he rolled off the hospital bed several times.   After the second or third time RM rolled off the bed, the nurses were sent out and Smith and at least one other officer allegedly stomped on RM's head while he was on the floor.   The nurses were allowed back into the room after the assault, at which point they assessed RM and due to the severity of the injuries called for an ambulance to transport RM to a hospital.   RM subsequently died as the result of blunt force trauma sustained during the altercation.

After RM was taken to the hospital and the activity from the incident had subsided, as senior officer, Smith was responsible for preserving the scenes until his superiors came. Instead, the VCF emergency room was thoroughly cleaned by the nurses, the officers' uniforms including the boots used in stomping RM's head were not gathered, pictures were

not taken of the guards or the scenes where each assault took place, a broken baton used on RM was taken to the shift office and never seen again, none of the night sticks or batons were collected, and it is alleged the handcuffs worn by RM that night are not the same pair now in the evidence room.

### III.   DISCUSSION

Smith alleges several key pieces of evidence were not properly preserved, and that without this evidence he is prevented from "obtaining a fundamentally fair trial, comporting with Due Process." *See* Doc. 112 at 3. Smith avers that the failure to preserve evidence was done in bad faith, and accordingly he is due proper relief, dismissal of the case at bar. The evidence Smith cites:

> the government failed to preserve the scenes of the various altercations, failed to preserve the physical items involved in the altercations, and failed to seize and preserve critical evidence. No photographs were taken of the locations of the altercations, showing the condition or circumstances of those locations immediately after the altercations. No effort was made to preserve the handcuffs, night sticks, and batons involved in the altercations. No photographs were taken of any participants in the altercation, other than RM. No effort was made to obtain the shoes, pants, or shirts of the officers involved in the altercations.

*See* Doc. 112 at 2. Smith claims that "[a]ll of these items and evidence are material to the determination of the individual blows or individual persons responsible for the fatal blows." *Id.*

The Government concedes that none of the items listed by Smith were collected as evidence. However, the Government contends that Smith has failed to meet his burden to prove the constitutional violation. The Government asserts that Smith's motion is

"inaccurate and fails to acknowledge his role in the alleged failure to preserve evidence," and that Smith did not meet his burden of proving that the evidence was "apparently exculpatory" or that the Government acted in bad faith. *Id.* The Government cites to a line of binding case law which stands for the notion that a defendant must prove either that the destroyed evidence was "apparently exculpatory," meaning that it must be apparent that the evidence is exculpatory *before* it is destroyed, or a defendant can prove that the evidence is "potentially useful" and the Government acted in bad faith. *See* Doc. 134 at 2-5; *see also Illinois v. Fisher*, 540 U.S. 544, 549, 124 S. Ct. 1200, 1203, 157 L. Ed. 2d 1060 (2004); *Arizona v. Youngblood*, 488 U.S. 51, 55, 109 S. Ct. 333, 336, 102 L. Ed. 2d 281 (1988); *California v. Trombetta*, 467 U.S. 479, 485, 104 S. Ct. 2528, 2532, 81 L. Ed. 2d 413 (1984); *Olszewski v. Spencer*, 466 F.3d 47 (1st Cir. 2006) (cited by *United States v. McMurphy*, 1:08-CR-175-TFM, 2009 WL 4042901 (M.D. Ala. Nov. 19, 2009); and *United States v. Hinton*, 2:07CR14-SRW, 2007 WL 2670038 (M.D. Ala. Sept. 10, 2007)).

## A.    "Apparently Exculpatory"

First, Smith does not even allege that the destroyed evidence is "apparently exculpatory." Smith argues that had the items been preserved "an expert in forensic serology and blood stain pattern interpretation could have examined these items and reconstructed who came into contact with RM and the amount and type of force used during these contacts." *See* Doc. 112 at 2. Additionally, Smith argues had photographs been taken of each location where altercations occurred, they "would have contributed materially to

establishing what happened in each location," and he continues by stating that the "*potentially exculpatory* nature of this evidence was apparent at the time law enforcement were notified of the altercation on August 4, 2010." *Id.* (emphasis added). The law is clear when it comes to lost or destroyed evidence; "[t]o meet this standard of constitutional materiality, evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *Trombetta*, 467 U.S. at 489 (citing *United States v. Agurs*, 427 U.S. 97, 109-110, 96 S. Ct. 2392, 2400 (1976)).

Smith made no assertion nor presented any evidence that any piece of destroyed evidence had exculpatory value apparent on its face, or that the Government acted in bad faith in destroying evidence, or that any evidence had exculpatory value at all. Instead, Smith asserts that testing and recreation *could* assist in telling the story of how everything occurred that night. During the hearing, counsel for Smith again only claimed that "I think what they could have done is reconstruct specifically what happened in specifically three areas that we think are important," but not once did they allege what piece of lost or destroyed evidence exculpates Smith. *See* Doc. 166 at 36. The Magistrate Judge agrees with the assertion that proper preservation of the crime scenes and the evidence is important and testing may have helped paint a clearer picture of the events that unfolded that night; however, its importance and what the evidence "may," "might," or "could" have shown is not relevant to whether evidence is "apparently exculpatory." The Magistrate Judge finds that none of the evidence

meets the standard of constitutional materiality.

**B.    "Potentially Useful" and "Bad Faith"**

Next, Smith could still meet his burden by proving that the evidence is "potentially useful," coupled with a showing of bad faith on the part of the Government.  Although the Government does not readily concede this point, the Magistrate Judge does find that each piece of evidence listed by Smith is "potentially useful" in his defense.  Undoubtedly, photographs of each crime scene, the officer's uniforms, and batons used could help the defense paint different scenarios of how things may have occurred, and perhaps raise reasonable doubt.  However, to meet the standard of constitutional materiality, Smith must also prove that the Government acted in bad faith.  Smith does not present any evidence of bad faith in his filing, but rather simply makes a blanket assertion, so the Magistrate Judge has only the testimony presented on the matter during the hearings held to find bad faith.  *See* Docs. 165-66.

*1.    Nurses Dianne Teal and Coy Flenory*

To show bad faith, Smith first called Licensed Nurse Dianne Teal ("Nurse Teal") and Registered Nurse Coy Flenory ("Nurse Flenory") to testify.  *See* Doc 165 at 164, 206.  Nurses Teal and Flenory are contract employees who work at VCF.  Both nurses testified that it is standard protocol to clean the ER after an inmate is seen at the location.  Nurses Teal and Flenory cited safety concerns of allowing blood, supplies used such as hypodermic needles, gauzes, etc. being left out when subsequent inmates visit the facility as reasons they are

required to keep the ER clean.  This testimony of Nurses Teal and Flenory was echoed by

Mr. Yarborough from the ADOC.  Both nurses also said that the ADOC has never trained

them in preservation of evidence or crime scenes.  More importantly, both nurses also

testified that they were not aware of any crime or that the ER was a crime scene.  They did

testify that an inmate being taken away in an ambulance is not a frequent occurrence at VCF;

however, they acted under standard operating protocol when they cleaned the ER once RM

was taken to the hospital in the ambulance.

Although the Magistrate Judge notes the ADOC's lack of training on the preservation

of evidence for its hospital staff is likely not good policy, nothing in either nurses' testimony

indicates any bad faith.  An argument may be made that the ADOC is acting negligent in not

providing such training, but the nurses simply acted as they have acted after the admission

of any other inmate into the ER.  Smith does not cite to any orders being given by any senior

officer, internal affairs, or Government investigators telling the nurses to clean up the ER.

In fact, Smith was the senior officer until the warden came to the scene, and it would have

been within the scope of his duties to direct the nurses *not* to clean up the ER and to prevent

anyone from going in or out of that area.  It is obvious that there is no evidence of bad faith

involved in the cleaning of the ER, and Smith's own inaction contributed to the loss of

evidence which might have been in the ER.

2.   *Warden Jesse Giles*

Next, Smith called Warden Jesse Giles ("Warden Giles") to testify at the hearing to

demonstrate bad faith by Warden Giles because he said he did not want to know what happened in an effort to prevent his name coming up in any sort of cover up if there ended up being criminal implications. *See* Doc. 165 at 226. During his testimony, Warden Giles said he received a phone call at home from Captain Specks about an altercation with an inmate and that the injuries were serious. Warden Giles then drove approximately thirty-five miles to VCF, and upon arrival he spoke with Smith about the incident. Warden Giles said he did not interview any other witnesses because he knew Internal Affairs ("IA") would soon arrive. Although Warden Giles was the senior officer upon his arrival at VCF, he stated that after having knowledge that IA was in route, he made the decision not to get involved in the investigation because he did not want any suspicion about impropriety or suggestions that he interfered to protect his employees. The main reason that the thoughts of impropriety came up was because Warden Giles believed the injuries to RM were far more severe than the routine matter Smith said it was. Warden Giles said had IA not been in route, he would have conducted the full investigation himself. Warden Giles did direct Captain Cedric Specks ("Captain Specks") to take some photographs before IA came, and he received RM's handcuffs at which point he created and signed the documents of receipt.

The most telling part of Warden Giles' testimony is his statements referencing Smith's responsibilities for preserving evidence and the crime scenes. Warden Giles said when he got to VCF the incident did not raise criminal suspicion, nor was Smith personally suspected of any wrong doing initially, the fact remains that Smith had been trained and was, by virtue

of position responsible for securing any crime scenes.  Warden Giles confirmed that Smith was the senior officer and that ADOC policy says that the warden *or* senior officer is in charge of securing the scene.  Since Warden Giles was not on duty that night, Smith was responsible for directing photographs to be taken, assisting IA, deploying officers to secure each of the scenes, and preserving all evidence for inspection by IA until he was relieved as the senior officer.  In short, Smith accuses the Government of not preserving evidence that he was under a duty to preserve.

Smith took some steps to preserve evidence, which indicates that he knew he was under a duty to do so.  *See* 165 at 264.  Smith directed Officer Brooks to retrieve a camera, directed the nurses to do at least one body chart, and took possession of a broken fiberglass baton that has since gone missing.  The most egregious part of his accusation is that Smith lists his *own* uniform, boots, and baton as items that the Government failed to preserve. Although under a different set of operating facts, this Court in *McMurphy* noted that "McMurphy had the opportunity to preserve the evidence if she so chose. [. . .] Therefore, McMurphy cannot put the blame entirely on the government."  *McMurphy*, 2009 WL 4042901, at *3 n. 2.  Even moreso, Smith had a duty to preserve the crime scenes and did not fully discharge his duties.  The Magistrate Judge credits Warden Giles' testimony that he wanted the IA to conduct the investigation unimpeded, therefore the Magistrate Judge does not find any bad faith with regard to Warden Giles and his performance of duties that night.

3.    *Captain Cedric Specks*

Smith also called Officer Specks to testify. *See* Doc. 165 at 239. Captain Specks came to the scene after Warden Giles, so Captain Specks was not the senior officer at anytime that night. Warden Giles ordered Captain Specks to take pictures, at which time Captain Specks said he retrieved a camera and began taking photographs of officers and RM based on the procedure he already knew to follow. Captain Specks testified that once he got a few more details about the incident, and upon IA's arrival, he chose to stop taking photos and escorted IA around to assist them with their investigation. IA continued to take pictures so Captain Specks did not finish taking all of the pictures he otherwise would have under standard procedure. Captain Specks testified that the reason he only took pictures of Officer Brown is because she was the one who was assaulted, and the other officers were not suspects of any wrongdoing at the time.

The only evidence presented with regards to Captain Specks' role in the failure to preserve evidence is that he did not conduct a full investigation. First, Captain Specks was not, at any point, the senior officer on duty that night. Second, upon arrival Captain Specks followed the orders given by Warden Giles and began taking pictures. Captain Specks stopped taking pictures when IA came, at which time he immediately assisted the IA investigators in conducting their investigation. The evidence shows Captain Specks was only under a duty to follow the orders he was given the night of the incident and had no duty to secure scenes or preserve evidence other than take photographs. Likewise, Captain Specks' assistance given to the IA investigators during their investigation only shows his willingness

to assist the IA in gathering the facts and evidence required to make a determination of what happened the night of August 4, 2010. The Magistrate Judge finds that Smith failed to make any showing of bad faith with respect to Captain Specks.

   4.   *Retired Captain Mary Taylor*

   Smith called retired VCF Captain Mary Taylor ("Captain Taylor") to testify. Captain Taylor said that she was not on duty the night of the incident, and did not arrive at VCF until early the next morning. *See* Doc. 165 at 252. Upon Captain Taylor's arrival, Warden Giles told her to fill out the top of the evidence forms for several pieces of evidence. Captain Taylor said it is customary that she have the evidence in her possession while completing evidence reports; however, Warden Giles told her that the evidence had already been turned over to investigating authorities. Captain Taylor said she filled out forms for a collapsible baton, a bath cloth, and a lock of hair. Captain Taylor filled out the information according to Ms. Flenory's description, then gave two of the three copies to Ms. Flenory and the other copy to Warden Giles. The only argument Smith attempts to make with respect to Captain Taylor's role with the evidence is that traditionally she would have the pieces of evidence at the time she filled out the reports. However, due to her indication that the evidence had already been turned over to investigating authorities, and the fact that Smith was able to review said evidence at the Federal Bureau of Investigation's ("FBI") office, there is no actual dispute here as to bad faith. The evidence discussed by Captain Taylor was in fact preserved and Smith had the opportunity to review the evidence.

5.    *FBI Special Agent Susan Hanson*

Finally, Smith called FBI Special Agent Susan Hanson ("Agent Hanson") to testify. *See* Doc. 166 at 3. Smith's questioning of Agent Hanson was primarily related to the responsibilities of some of the witnesses that previously testified, as opposed to any allegations of wrongdoing on the part of Agent Hanson with respect to evidence preservation. Much of Agent Hanson' testimony directly addresses Smith's possible role in the failures that occurred in preserving the crime scenes and evidence. Agent Hanson interviewed Warden Giles based upon her concern that Smith was the officer in charge of the facility, yet he did not preserve the crime scenes. *See* Doc. 166 at 8. Agent Hanson even asserted her suspicion that Smith tampered with the crime scenes and/or destroyed evidence, and that Warden Giles had, at the time, completely failed to hold him accountable for it. *Id.*

Although, Agent Hanson agreed that upon Warden Giles' arrival he was then in charge and he failed to take any action, Agent Hanson stated that the crime scenes and evidence "should have been secured prior to the point that Captain Specks and Warden Giles arrived on the scene." *Id.* Agent Hanson noted that Captain Specks and Warden Giles were not there when the altercations took place, and there was no way for them to have known where and which scenes that needed to be preserved. *See* Doc. 166 at 8-9. Smith asserts that upon arriving, Warden Giles asked Smith what had happened and at that point should have known. As Smith mentioned, Warden Giles did not believe Smith's version of events, and was quoted as calling Smith's explanation "bull----." *See* Doc. 166 at 30. This only serves

to reinforce the idea that Warden Giles did not have an accurate understanding of the events that transpired that night but was confident the IA investigation would be thorough.  Warden Giles also told Agent Hanson that he was under the belief that Smith and others were already in the process of preserving whatever scenes needed to be preserved.  *See* Doc. 166 at 9.

Agent Hanson also discussed crime scene procedures with Mr. Yarborough from ADOC due to her concern about the lack of crime scene preservation and the possibility of evidence tampering and destruction by Smith.  *See* Doc. 166 at 12.  Agent Hanson was also concerned because the potential evidence tampering and destruction was not reported by anyone within IA.  Agent Hanson noted that Mr. Yarborough seemed fairly dismissive in the sense that he called the term "coverup" too harsh, he did not hold anyone accountable, and he did not consider the possibility that there could be an additional crime by destroying, covering up, or tainting the crime scenes.  *See* Doc. 166 at 13-14.  Yarborough explained that law enforcement inside a prison context is not the same as law enforcement in the traditional sense, in that they have to consider the potential for bio hazards as a result of blood and other bodily fluids coming into contact with other prisoners or staff.  Although VCF was on lock down at the time, the crime scene extended throughout a large portion of the VCF, all of which practically could not remain under lock down for a long period of time.

When questioned about how she came to the conclusion that Smith may have covered up or destroyed evidence, Agent Hanson cited to several questionable discoveries that she made.  First, Agent Hanson noted that the FBI was looking for a fiberglass baton that

witnesses said was used in the altercation which took place in Smith's office. *See* Doc. 166 at 24.  Agent Hanson testified that a witness reported RM was struck over the head with the baton and it broke into two pieces and was placed in Smith's office. *See* Doc. 166 at 25. Agent Hanson also indicated that from her review of the pictures taken of Smith's office, it appeared to have been cleaned up to reflect Smith's version of the incident. *Id.*  Agent Hanson noted that all which was apparent in Smith's office was residue from pepper spray; however, witness testimony about the altercation would indicate that there would have been other evidence present as well. *See* Doc. 166 at 32.  Agent Hanson stated that all that remained was the pool of pepper spray on the floor, but otherwise the office looked sterile. *Id.*

Additionally, Agent Hanson pointed to the fact that Smith was at each scene early enough to begin ordering the preservation of each. *See* Doc. 166 at 25.  Smith is said to have arrived at the D-Dorm site simultaneous to RM running toward F-Dorm while being pursued by other officers. *Id.*  Agent Hanson believes at this point Smith should have ordered all scenes in and around D-Dorm to be preserved. *Id.*  Next, Smith was inside the lieutenant's office while that alleged altercation took place, and once RM was removed from the office, Smith should have started preserving the crime scene there. *Id.*  Finally, Smith was also inside of the ER while RM was being checked and when the third alleged altercation took place, and once RM was taken away in an ambulance should have began to preserve the crime scene there. *Id.*  Agent Hanson testified that Smith was present at each of the crime

scenes before any other senior officer and was not only in the best position to preserve the scenes, but was under duty to do so. *Id.*

It is obvious from the content of Agent Hanson's testimony that she is not implicated in any showing of bad faith. The only assertions of bad faith mentioned by Smith is that Warden Giles' indifference was done in bad faith, and the fact that the ADOC has admitted other instances when crimes scenes were not properly preserved is a showing of systemic bad faith. *See* Doc 166 at 37-38. Smith has not made any showing of a "calculated effort to circumvent the disclosure requirements established by *Brady v. Maryland* and its progeny" and he has not made any "allegation of official animus towards [Smith] or of a conscious effort to suppress exculpatory evidence." *Trombetta*, 467 U.S. 479 at 488. Although the evidence does not demonstrate exemplary crime scene management, nothing in the record rises to the level of bad faith. This is especially magnified when one views Smith's extensive role in the failures that occurred in preserving the crime scenes and evidence at VCF, even up to allegations of tampering and destruction of evidence.

## IV.   CONCLUSION

Accordingly, it is the RECOMMENDATION of the Magistrate Judge that Smith's *Motion to Dismiss Due to Failure to Preserve Evidence* (Doc. 112) be **DENIED**

It is further ORDERED that the parties file any objections to the this Recommendation on or before **February 5, 2013.** Any objections filed must specifically identify the findings in the Magistrate Judge's Recommendation to which the party is objecting. Frivolous,

conclusive or general objections will not be considered by the District Court. The parties are advised that this Recommendation is not a final order of the court and, therefore, it is not appealable.

Failure to file written objections to the proposed findings and recommendations in the Magistrate Judge's report shall bar the party from a *de novo* determination by the District Court of issues covered in the report and shall bar the party from attacking on appeal factual findings in the report accepted or adopted by the District Court except upon grounds of plain error or manifest injustice. *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982); *see Stein v. Reynolds Securities, Inc.*, 667 F.2d 33 (11th Cir. 1982); *see also Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981, *en banc*) (adopting as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981).

DONE this 22nd day of January, 2013.

/s/ Terry F. Moorer
TERRY F. MOORER
UNITED STATES MAGISTRATE JUDGE